SO ORDERED: April 5, 2012.



*Basil H. Lorch III*
**Basil H. Lorch III
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | CASE NO. 10-93904-BHL-11 |
|     Debtor. | ) | |
| _____ | ) | |
| SUPERIOR LIVESTOCK AUCTION, INC., | ) | |
|     Plaintiff, | ) | |
|     v. | ) | ADV. NO. 11-59088 |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| JAMES KNAUER, as Chapter 11 Trustee for | ) | |
| Debtor, Eastern Livestock Co., LLC., | ) | |
|     Counterclaimant and Third-Party | ) | |
|     Plaintiff, | ) | |
|     v. | ) | |
| | ) | |
| SUPERIOR LIVESTOCK AUCTION, INC., | ) | |
| FIFTH THIRD BANK, FRIONA | ) | |
| INDUSTRIES, L.P., CACTUS GROWERS, INC., | ) | |
| and J & F OKLAHOMA HOLDINGS, INC., | ) | |
|     Counterclaim and Third-Party | ) | |
|     Defendants. | ) | |
| _____ | ) | |

**ORDER ON PLAINTIFF'S MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS**

This proceeding was initiated by the filing of the Complaint of Superior Livestock Auction, Inc. for Declaratory Relief on April 12, 2011, and comes before the Court on the **Motion for Partial Judgment on the Pleadings filed by Superior Livestock Auction, Inc.** [Docket No. 32], which was filed on July 19, 2011. The **Trustee's Response to Superior Livestock's Motion for Partial Judgment on the Pleadings** was filed on September 29, 2011, and the **Third Party Defendants' Joint Response to Superior Livestock's Motion for Partial Judgment on the Pleadings** was filed on November 8, 2011. Finally, **Fifth Third Bank's Response to the Motion for Partial Judgment on the Pleadings Filed by Superior Livestock Auction, Inc.** was filed on November 14, 2011, followed by the Plaintiff's **Reply to Responses to Superior Livestock Auction, Inc.'s Motion for Partial Judgment on the Pleadings**, which was filed on November 28, 2011.

Superior Livestock Auction, Inc. ["Superior"], by and through its Motion, asserts that it is entitled to judgment on the following issues: (1) that certain assigned Eastern Livestock contracts ["Buy Contracts"] are forward contracts as that term in defined by the Bankruptcy Code (Count II); (2) that Superior is a forward contract merchant as that term is defined by the Bankruptcy Code (Count III); (3) that the Buy Contracts are swap agreements as that term is defined by the Bankruptcy Code (Count IV); and (4) that Superior is a swap participant as that term is defined by the Bankruptcy Code (Count V).

<u>Background Facts</u>

According to its Complaint for Declaratory Relief, Superior conducts video auctions and operates as a third-party broker for ranchers, farmers, and other producers [collectively "Farmers"] of cattle. Superior conducts its operations from its headquarters in Brush, Colorado, but engages

representatives throughout the United States to solicit cattle from Farmers for Superior's auctions.

Farmers sold a total of 54,019 head of cattle to the Debtor, Eastern Livestock Co., LLC ["Eastern"], through auctions conducted by Superior. Those sales were memorialized by 500 written contracts, or Buy Contracts, between the Farmers and Eastern that are the subject of this adversary proceeding.[1]

Eastern acted as a dealer or "middleman" buying and selling cattle, typically entering into contracts with third-party buyers to resell the cattle that Eastern bought at Superior's auctions before the Farmers actually delivered the purchased cattle. Generally, Eastern arranged the deliveries and directed the Farmers to deliver Eastern's cattle directly to designated truckers for transport to Eastern's third-party buyers. Pursuant to the terms of the Buy Contracts, Eastern paid Superior, for the benefit of the Farmers, down payments of $40 per head contemporaneously with the execution of the Buy Contracts with the remainder of the purchase price due at delivery. Eastern never paid the balance due to the Farmers as specified in the Buy Contracts.

Pursuant to separate agreements between Superior and the individual Farmers, and regulations imposed on Superior by virtue of the Packers and Stockyards Act ["PASA"][2], Superior asserts that it was obligated to pay the Farmers the full purchase price of the cattle in the event of a default by the purchaser under the Buy Contracts. Superior became aware of its potential exposure when it learned of the financial collapse of Eastern in early November 2010. On or around November 8, 2010, and prior to the appointment of a state court receiver over Eastern and its assets,

---

[1] While Superior facilitated significantly more transactions than the 500 that are the subject of this proceeding, it has limited the Court's consideration to only these particular contracts.

[2] 7 U.S.C. §§ 181 - 229c.

3

Superior and Eastern entered into an "Assignment of Livestock Contracts" ["Assignment"] wherein Eastern purported to convey to Superior all of its right, title, and interest in the Buy Contracts, including the cattle which are the subject thereof, and all deposits made to sellers thereunder. A state court receiver was appointed the following day, and within sixty (60) days thereafter, the underlying bankruptcy case was initiated when Superior filed an involuntary petition on Eastern's behalf.

Superior, in its Motion for Partial Judgment on the Pleadings, seeks a determination that the 500 Buy Contracts are "forward" contracts and asks the Court to determine that it is a forward contract merchant and/or swap participant. That finding would qualify Superior for the "safe harbor" protection afforded by virtue of 11 U.S.C. 546(e) and (g). While such a ruling would serve to protect Superior from the Trustee's strong arm, preference, or fraudulent transfer claims under sections 544, 547 and 548(a)(1)(B), it would not provide a defense to the Trustee's claim under 11 U.S.C. § 548(a)(1)(A).

The issues now before the Court have been presented in an unusual procedural posture. Any question regarding Superior's status as a forward contract merchant or swap participant would typically arise in the context of an avoidance action brought in due course by the Trustee. In this case, however, the Court is being asked to make a determination of the Trustee's rights and remedies in advance. The Court, finding no prejudice to the Trustee to proceed in this manner, shall begin its analysis with the appropriate standard of review.

## Standard of Review

The Court reviews a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c)[3] under the same standard for a motion to dismiss for failure to state a claim under

---

[3] This rule is incorporated by reference in Federal Rule of Bankruptcy Procedure 7012.

Rule 12(b). *Buchanon-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). In such motions, the Court may only consider the contents of the pleadings and those documents incorporated by reference as well as matters of public record. *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991).

All well-pleaded allegations contained in the nonmovant's pleadings are taken as true, *Gillman v. Burlington Northern Railroad Co.*, 878 F.2d 1020, 1022 (7th Cir. 1989). Judgment may not be granted unless the undisputed facts "clearly entitle the moving party to judgment" and it appears "beyond doubt" and as "a certainty" that no set of facts support the nonmovant's claims and defenses. *In re Amica, Inc.*, 130 B.R. 792, 795-96 (Bankr.N.D.Ill 1991). The procedural and substantive rights of a nonmoving party should be determined "as fully and fairly on a Rule 12(c) motion as if there had been a trial on the merits." 5C Wright & Miller § 1367, p. 230; *see also Alexander v. City of Chicago*, 994 F.2d 333 (7th Cir. 1993).

Discussion

Perhaps the best place to begin the Court's analysis is with the safe harbor provision itself. Section 546(e) of the Code provides that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(b)(1)(A) of this title.

Superior seeks a finding that the Buy Contracts are forward contracts and that it is a forward contract

5

merchant. As such, under the foregoing provision, the trustee may not avoid any prepetition transfers made by or to Superior or for the benefit of Superior in connection with those contracts.

As noted by the Seventh Circuit in *Lachmund v. ADM Investor Services, Incorporated*, 191 F.3d 777 (1999), "[c]ash forward contracts permit parties who contemplate the physical transfer of a commodity to guarantee themselves, prior to the time of delivery, a buyer (or a seller) at a particular price, even though convenience or necessity requires delayed delivery or shipment. *Id.* at 786 (*citing Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998); *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 577-78 (9th Cir. 1982)). In *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436, 441 (7th Cir. 2000), the court of appeals went on to outline a "totality of circumstances" analysis, suggesting that the following features characterize a forward contract: (1) the contract specifies specific terms regarding place of delivery, quantity, or other terms; (2) the contract is between industry participants, such as farmers and grain merchants; and (3) delivery cannot be deferred forever.

To determine whether the Buy Contracts fit within the parameters of a forward contract, the Court must begin with the definition set forth in § 101(25) of the Bankruptcy Code:

> "forward contract" means a contract (other than a commodity contract, as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in this section ), consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement.

Initially, the Court must ascertain whether the subject cattle may be considered a "commodity" under § 761(8). That provision adopts the broad definition of "commodity" found in § 1(a)(4) of the

Commodity Exchange Act[4] which specifically includes "livestock" within its ambit. The Trustee and other parties, in response to this Motion, strenuously object to the characterization of the subject cattle as "livestock" and attempt to insinuate a fungibility requirement into the statutory definition.

If a statute is clear and unambiguous on its face, it should be enforced according to the terms outlined. *Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). In other words, the plain meaning of a statute should be followed unless it will produce an absurd result or a result at odds with the intent of Congress. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Based upon the plain meaning of the statute, the Court is satisfied that the subject cattle qualify as livestock, in keeping with the letter and spirit of the law, thus meeting the definition of a commodity as set forth therein.

Having cleared the first hurdle, the Court must next consider whether the contracts contain an appropriate maturity date to qualify for treatment as a forward contract. As pointed out by the court in *In re Renew Energy LLC*, 2011 WL 3793157 (Bankr. W.D. Wis.), no court has explicitly defined the term "maturity date." That court employed a common sense definition and found "maturity date" to mean "the date on which delivery has occurred and payment to 'settle' is due." *Id.* This Court agrees that the maturity date is the date on which delivery is made, insofar as that date completes the sellers' obligations under the forward contract and triggers the buyers' obligation to settle the account.

While the Trustee has argued that a discreet subset of the 500 contracts did not have a maturity date outside the two-day period, it is undisputed that the majority of the Buy Contracts provided for delivery and payment well outside of that prescribed time period. The Court finds that,

---

[4] 7 U.S.C. § 1 *et al.*

to the extent that delivery was made more than two days after the date the contracts were entered into, such contracts fit within the confines of a forward contract.

The Court, finding that the Buy Contracts contain specific terms regarding payment, quantity and delivery and finding that the Buy Contracts are between industry participants and not speculators in the market, concludes that the totality of the circumstances establish that the Buy Contracts are forward contracts. The Plaintiff's Motion for Judgment on the Pleadings is, accordingly, **GRANTED** in accordance with the foregoing on Count II in regard to the forward contract issue.

The issue of whether Superior may be considered a forward contract merchant is a little more difficult and, as at least one court observed, perhaps more probative. *See In re Mirant Corp.*, 310 B.R. 548 (Bankr. N.D. Tex. 2004). That court opined that the "Congressional purpose behind provisions dealing with forward contracts [] was not to affect a class of transactions (i.e., forward contracts), but rather was to protect certain persons (i.e., those engaged in the forward contract trade) and the market in which they were participants."[5] *Id.* at 567.

In defining a forward contract merchant, the *Mirant* court stated that the "key portion of the definition of forward contract merchant is 'a person whose *business* consists in whole or in part of entering into forward contracts as or with a *merchant*. . . .'" 310 B.R. at 567 (emphasis supplied). The court went on to find that "business" is "something one engages in to generate a profit" and a

---

[5] "The House Report to the 1990 amendment to the definition of "forward contract" makes clear in the first line of its statement of purpose that the intention of the amendment was to ensure that the "*forward contract markets are not destabilized* by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rpt. 101- 484, p. 1, U.S. Code Cong. & Admin.News 1990, p. 223 (emphasis added). The House Report also speaks in terms of forward contract merchants entering into series of transactions with individuals, businesses and other entities. *Id.*, p. 4. Thus, Congress's intention was to ensure stability in the market; through enactment of provisions that would protect its participants." *Mirant*, 310 B.R. at fn 29.

"merchant is one that is not acting as either an end-user or a producer. Rather, a merchant is one that buys, sells or trades in a market." *Id.* at 567-568 (citations omitted). Therefore, a "forward contract merchant" is "a person that, in order to profit, engages in the forward contract trade as a merchant or with merchants." *Id.* at 568.

According to another court, forward contracts are negotiated between industry participants and forward contract merchants. *In re MBS Management Services, Inc.*, 432 B.R. 570 (Bankr. E.D. La. 2010). "The industry participants are either producers or users of the commodity who sell or purchase the commodity in advance to hedge against price fluctuations. Forward contract merchants create or manage commodity markets by providing a place for industry participants to buy or sell a commodity in advance of its actual production." *Id.* at 575.

Superior seems to fit within the foregoing general definitions of a forward contract merchant. Superior acted as a intermediary by facilitating livestock auction sales as a third-party broker, thus putting producers together with buyers in advance of the actual delivery of cattle. Likewise, assuming that the livestock market is properly included within the "forward contract trade," Superior presumably engaged in the forward contract trade in order to secure a profit.

That does not, however, end the analysis. The *Mirant* court, citing *Williams v. Morgan Stanley Capital Group (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 740 (5th Cir. 2002), held that "the issue of entitlement to the benefits and protection of section 546(e) principally depends on whether the party invoking those protections is *acting* as a forward contract merchant *in its transactions with the debtor.*" 310 B.R. at 569 (emphasis added). The next and most important consideration, therefore, is whether Superior was acting as a forward contract merchant in its transactions with Eastern. That is a question that the Court is unable to answer at this point in the

proceedings.

There are two categories of transactions that Superior and Eastern were parties to. The first category includes the 500 individual Buy Contracts wherein Eastern paid Superior, as the facilitator and agent for the Farmers, $40 per head of cattle purchased under the terms of the Buy Contracts. The other transaction which Superior and Eastern entered into, which is the subject of a separate Motion for Partial Summary Judgment filed by the Trustee, is the Assignment of Livestock Contracts dated November 8, 2010, wherein Eastern purported to assign to Superior of all of it's right, title and interest in the Buy Contracts.

Because the Court has not heard any testimony or evidence as to the circumstances of those transactions, the Court must **DENY** the Motion for Judgment on the Pleadings on Court III regarding Superior's status as forward contract merchant.

Next, Superior seeks a ruling on Counts IV and V of its Complaint that the Buy Contracts are "swap agreements" under 11 U.S.C. § 101(53B) and that it is a "swap participant" as defined by 11 U.S.C. § 101(53C). The basis of Superior's argument is that if the Buy Contracts are forward contracts then they must necessarily be "swap agreements" and consequently, since a "swap participant" is any entity that has an outstanding swap agreement with the debtor, it must necessarily be a "swap participant".

In *In re National Gas Distributors, LLC*, 556 F.3d 247 (4th Cir. 2009), the Fourth Circuit acknowledged the difficulty in resolving this issue, noting that Congress's "repetitive generalized comments about protecting financial markets from the instability that bankruptcy proceedings might cause and the potpourri of agreements included in the term 'swap agreement' barely distinguish any major commercial contract from a swap agreement." *Id.* at 259. In that case there had been no

10

allegation that the contracts in issue were forward contracts. Instead, the issue was whether the contracts were commodity forward agreements as that term is used in 11 U.S.C. §101(53B). The court of appeals, reversing the bankruptcy court's conclusion that the contracts were simple supply contracts and not commodity forward agreements, remanded with instructions, noting that while not every forward agreement is a forward contract, every forward contract is a forward agreement. *Id.* at 257.

If this Court accepts that logic, having concluded that the Buy Contracts are forward contracts, they would indeed fall within the broader classification of swap agreements. Nevertheless, the Trustee argues that the analysis is not quite so simple, citing contrary case law which holds that industry interpretations govern what constitutes a swap agreement. *McKittrick v. Nat'l Fuel Mktg*, 2011 WL 2078527, *1-2 (Bankr. D. Or. May 25, 2011) (citing Morrison & Riegel, 13 Am. Bankr. Inst. L. Rev. 641); *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.)*, 328 B.R. 58, 70 (Bankr. S.D.N.Y. 2005). In fact, even the *National Gas* court noted that Congress sought to require at least some relationship between a commodity forward agreement and the financial markets. 556 F.3d 247, 260.

There is no dispute that the purpose of § 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Enron Corp. v. Bear, Stearns Int'l (In re Enron Corp.)*, 323 B.R. 857, 864 (Bankr. S.D.N.Y 2005) (citing *Kaiser Steel Corp. v. Charles Schwab & Co. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 848 (10th Cir. 1990)). There has been no evidence presented at this stage of the proceedings to ascertain whether there is, in fact, any relationship between the Buy Contracts and the financial markets. Because the Court cannot say that it appears "beyond doubt" that no set of facts support the Trustee's claims and

11

defenses, Superior's Motion for Judgment on the Pleadings as to Counts IV and V of its Complaint is, accordingly, **DENIED.**

###